# EXHIBIT A

```
IN THE UNITED STATES DISTRICT COURT
      FOR THE WESTERN DISTRICT
          OF PENNSYLVANIA
         * * * * * * * *
JOHN LEWIS          *  Civil Action No.
GERHOLT, SR.,       *  2:13-CV-00007-
    Plaintiff      *  KRG-KAP
    vs.             *
DONALD ORR, JR.,    *  JURY TRIAL
Warden,             *  DEMANDED
individually,       *
    Defendant       *
         * * * * * * * *

            DEPOSITION OF
        JOHN LEWIS GERHOLT, SR.
            April 16, 2014

                COPY


Any reproduction of this transcript is
prohibited without authorization by
        the certifying agency.
```

Sargent's Court Reporting Service, Inc.
(814) 536-8908

---

```
 1             DEPOSITION
 2                OF
 3  JOHN LEWIS GERHOLT, SR., taken on
 4  behalf of the Defendant herein,
 5  pursuant to the Rules of Civil
 6  Procedure, taken before me, the
 7  undersigned, Jennifer D. Crawford, a
 8  Court Reporter and Notary Public in
 9  and for the Commonwealth of
10  Pennsylvania, at SCI-Graterford, Route
11  29, Graterford, Pennsylvania, on
12  Wednesday, April 16, 2014 beginning at
13  10:22 a.m.
14
15
16
17
18
19
20
21
22
23
24
25
```

Sargent's Court Reporting Service, Inc.
(814) 536-8908

---

```
                                        3
 1        A P P E A R A N C E S
 2
 3  JOHN LEWIS GERHOLT, SR., PRO SE
 4
 5
 6  MICHAEL R. LETTRICH, ESQUIRE
 7  Jones Passodelis, PLLC
 8  Gulf Tower
 9  Suite 3510
10  707 Grant Street
11  Pittsburgh, PA   15219
12      COUNSEL FOR DEFENDANT
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Sargent's Court Reporting Service, Inc.
(814) 536-8908

---

```
                                        4
 1             I N D E X
 2
 3  WITNESS: JOHN LEWIS GERHOLT, SR.
 4  EXAMINATION
 5     By Attorney Lettrich      7 - 75
 6  CERTIFICATE                      76
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Sargent's Court Reporting Service, Inc.
(814) 536-8908

```
                                    5
              EXHIBIT PAGE

                              PAGE
   NUMBER   DESCRIPTION    IDENTIFIED
              NONE OFFERED
```

Sargent's Court Reporting Service, Inc.
(814) 536-8908

```
                                    6
              OBJECTION PAGE

   ATTORNEY                     PAGE
              NONE MADE
```

Sargent's Court Reporting Service, Inc.
(814) 536-8908

---

                                                                    7

1        P R O C E E D I N G S
2   ----------------------------------------
3   JOHN LEWIS GERHOLT, SR., HAVING FIRST
4   BEEN DULY SWORN, TESTIFIED AS FOLLOWS:
5   ----------------------------------------
6   EXAMINATION
7   BY ATTORNEY LETTRICH:
8   Q.    Good morning, Mr. Gerholt. My
9   name is Mike Lettrich and I am an
10  attorney for Warden Orr in this case.
11  We met briefly before the deposition
12  began, but I just wanted to explain
13  for you a little bit about the process
14  we're here for today. This is what's
15  called a deposition. What that is is
16  in a civil lawsuit, it's an
17  opportunity for Defense Counsel to
18  learn what you, as a Plaintiff, may
19  know about your lawsuit, some of the
20  facts and details of that, a little
21  bit about your background and how you
22  may be affected by any sort of
23  injuries you may have today.
24        It's not an interrogation. If
25  you need to use the restroom for any

                                                                    8

1   reason, you're certainly welcome to do
2   that. I'm not going to try to trick
3   you. If I ask a question and you
4   don't understand it, please let me
5   know and I'll be happy to rephrase it.
6         Similarly, I have a tendency to
7   talk a little bit quickly. If you
8   don't hear my question for any reason,
9   just let me know and I'd be happy to
10  restate it. So if you answer a
11  question, I'm going to assume you both
12  heard it and understood it; is that
13  fair?
14  A.    Yes.
15  Q.    As you can see, we have a Court
16  Reporter here. The Court Reporter is
17  going to record the questions that I
18  ask you and your responses. Some of
19  the things we can do for the Court
20  Reporter to make her job easier is,
21  first, it's very difficult for a Court
22  Reporter to record what's being said
23  when two people are talking at the
24  same time, so you may have a situation
25  where you know where I'm going with

Sargent's Court Reporting Service, Inc.
(814) 536-8908

Sargent's Court Reporting Service, Inc.
(814) 536-8908

**Page 9**

the question. If you could, wait until I finish the question before you answer, that will help her out tremendously; okay?

A. Uh-huh (yes).

Q. And then similarly, it's difficult for a Court Reporter to take down any sort of non-verbal responses, such as nods of the head or when a person says uh-huh or uh-uh, so if you can try to keep your responses verbal, it will keep the transcript clean and it will make life easier for her; okay?

A. Yes.

Q. Mr. Gerholt, are you on any medications that would affect your ability to answer truthfully here today?

A. No, I don't feel so.

Q. Okay. Let's get down to it. All right. You were born in 1970; is that correct?

A. Yes.

Q. So you would be 43 years old at

**Page 10**

this point?

A. Yes, sir.

Q. Birthday in July?

A. Yes, sir.

Q. And you are how tall?

A. Six, two.

Q. And how much do you weigh, sir?

A. 200.

Q. We are here at SCI Graterford where I understand that you are serving a sentence for homicide; is that correct?

A. Yes, sir.

Q. And you are presently appealing that sentence?

A. Yes, sir.

Q. What is the status of your appeal on your homicide? You have a PCRA petition or anything like that going at this point?

A. Yes, PCRA petition.

Q. Is there any timetable that you're aware of? Is it before the Superior Court or the Supreme Court at this point?

**Page 11**

A. It's still in county.

Q. Still in county; okay. Have you heard any timetable for when that may be resolved?

A. No, sir.

Q. It's my understanding that you pled no contest to that in August of 2012; is that correct?

A. August 21st, 2012, yes.

Q. And the alleged homicide was in 2008; is that correct?

A. Yes.

Q. Have you had any other convictions in the last ten years?

A. No, sir.

Q. We are presently at SCI-Graterford and obviously you've been incarcerated here for some period of time and you spent some period of time in the Bedford County Jail. Have you ever been in any other correctional facilities as an inmate?

A. As far as county or are you talking state?

Q. Yeah, any kind of correctional

**Page 12**

facility.

A. I was in Huntingdon County Jail for little things, and then Bedford and then obviously here.

Q. When would you have been in the Huntingdon County Jail?

A. I can't rightfully say.

Q. Okay. That's actually another thing that I forgot to mention earlier is that this is not a memory test of some sort. Just because I ask you a question, it doesn't mean you're necessarily going to have an answer for it, so if the fair answer is that you don't know or you don't recall, I don't want you to guess or speculate for me, so don't feel obligated to answer a question just simply because I ask it; okay?

A. Okay.

Q. So you were in the Bedford County Jail between May and August of 2012; is that correct?

A. Yeah, I was --- excuse me, November the 10th, the morning after,

13

1  it was November 10th, 2008 to
2  September the 11th, 2012, is the day I
3  left Bedford County Jail.
4  Q.    I see.  So you were in the
5  Bedford County Jail between November
6  8th, 2008 and September 11th, 2010?
7  A.    Yeah, I think it was the
8  morning of the 9th or the 10th of
9  November is when I got to Bedford Jail
10 because November the 9th was during
11 the afternoon when the alleged took
12 place to put me in the Bedford Jail,
13 so it was like 3:00 or 4:00 in the
14 morning the following day when I got
15 booked into Bedford, so it would have
16 been November 10th.
17 Q.    Thank you.  You were in the
18 Bedford County Jail as a pre-trial
19 detainee; is that correct?
20 A.    Yes.
21 Q.    Was the situation that bail was
22 set for you and you were unable to
23 make bail or that bail was denied to
24 you?
25 A.    Bail was denied.

14

1  Q.    Donald Orr was the warden of
2  the Bedford County Jail during the
3  course of your incarceration; is that
4  correct?
5  A.    I got there when one of the
6  wardens was retiring and then it went
7  a little while before we got a warden,
8  but Donald Orr was the warden at one
9  point when I was there, yes.
10 Q.    Do you recall what the --- let
11 me rephrase that.
12       Do you recall what the name of
13 the warden was when you first came to
14 Bedford County Jail?
15 A.    It's at the top of my head, but
16 I can't think of his name.  If I'd
17 hear it, I'd know, but I can't think
18 of it.
19 Q.    Was Mr. Orr working at the jail
20 in some other capacity when this other
21 warden was in charge?
22 A.    No.  It's my understanding that
23 I took from it that when the warden
24 retired when I was there, that the
25 deputy warden was, so to speak,

15

1  holding the fort down and then
2  sometime later, Donald Orr was hired
3  to take the warden position.
4  Q.    Do you recall when you first
5  met Warden Orr?
6  A.    I can't rightfully say as far
7  as --- I mean, I was on some
8  medication at the time and I just
9  can't recall as far as when, exactly.
10 Q.    When you mentioned that you
11 were on medication, can you tell me
12 what medication you were on?
13 A.    Just some medication like to
14 help me rest, you know, be able to
15 rest.
16 Q.    Was that the medication that
17 was prescribed to you by the jail
18 staff?
19 A.    Yes.
20 Q.    Do you recall what the name of
21 that medication was?
22 A.    No, I don't.
23 Q.    Before you went to the Bedford
24 County Jail, were you taking any sort
25 of medication of that type, for

16

1  example a sleep medication?
2  A.    No, sir.
3  Q.    Had you been taking any
4  medications before you came into the
5  Bedford County Jail?
6  A.    Not that I recall.
7  Q.    Before you came to the Bedford
8  County Jail on or about November 10th,
9  2008, did you have any problems with
10 your neck?
11 A.    No.
12 Q.    Did you have any problem with
13 your shoulders?
14 A.    No.
15 Q.    Did you have any problems with
16 anxiety or depression?
17 A.    No.
18 Q.    I understand that this lawsuit
19 involves an incident that occurred on
20 May 15, 2012; is that correct?
21 A.    Yes.
22 Q.    Had you sustained any injuries
23 in the Bedford County Jail between
24 November 10, 2008 and May 15, 2012?
25 A.    No.

17

1  Q.   Did you have any problems with
2  headaches before May 15th, 2012?
3  A.   No, sir.
4  Q.   Okay. Let's focus on May 15th,
5  2012. Can you tell me what happened
6  and what your lawsuit is about?
7  A.   Well, it was on Tuesday, May
8  the 15th, 2012. I was sleeping in my
9  cell and the Defendant, Mr. Orr, came
10 into my cell and started yelling at me
11 to wake up and when I didn't respond
12 quickly enough for him, he started
13 getting really upset and mad, so
14 before I awoken, during while I was
15 awakening, he bends over and he puts
16 his hand around my throat and starts
17 to choke me and he's still screaming
18 and hollering at me to wake up, wake
19 up.
20      So once I awoken --- after I
21 was awake, he still had me by the
22 throat and he starts motioning, you
23 know, puts me forward and backward
24 rocking motion by my neck and my head
25 is banging off the back of the bunk

Sargent's Court Reporting Service, Inc.
(814) 536-8908

18

1  wall, off the concrete wall, and he's
2  yelling at me and telling me that I
3  was to stop writing the District
4  Attorney in Bedford, as well as the
5  Huntingdon State Police in regards to
6  stolen property that was taken from my
7  residence during my incarceration.
8       My cellmate was in there, Cory
9  Divelbiss, and he witnessed all this
10 going on and as Warden Orr was
11 continuously hitting my head off the
12 back of the --- where your head lays
13 against the concrete, my celly tells
14 him, you know, he yells at him and
15 tells him stop that, you know, this
16 ain't necessary, the man's not even
17 awake. Warden Orr turns around and
18 tells my celly, and I quote, told him
19 get the fuck out of here. If you know
20 what's good for you, go.
21      So with that tone of voice and
22 anger, my celly decided he better get
23 out of the cell because after all, it
24 is a direct order from the Warden. So
25 after that, after he gets done

Sargent's Court Reporting Service, Inc.
(814) 536-8908

19

1  thrashing my head against the back of
2  the wall, he tells me if I didn't stop
3  all this retaliation with the District
4  Attorney and the State Police by
5  writing them letters and stuff, that
6  he's see personally that I would spend
7  the rest of my life in prison
8  regardless if I was guilty or not and
9  he said that, you know, that came from
10 the District Attorney and him.
11      So Mr. Orr, after he was done
12 doing all that, he left the cell. He
13 left the cell and then it was probably
14 like 15, 20 minutes later, the
15 treatment specialist came in on the
16 block and I told the treatment
17 specialist what happened and, you
18 know, he tells me, he says well,
19 you're going to have to put a
20 complaint in for it. He said, but I
21 wouldn't put it in until after Mr. Orr
22 leaves, because if he sees the
23 complaint, he'll just throw it away.
24      So taking his advice, I filled
25 out a proper request form indicating

Sargent's Court Reporting Service, Inc.
(814) 536-8908

20

1  that I wanted to speak to Bedford
2  State Police in regards to that. I
3  sent it in, I got no response from
4  that request. Later that afternoon,
5  after Mr. Orr left, I seen the one
6  nurse and told her what happened and
7  she took me down to the office, gave
8  me some ibuprofen or whatever it was;
9  I don't know if it was Tylenol or
10 whatever, for headaches and just told
11 me that she would follow up on that.
12      So afterwards, the next day, I
13 seen the treatment specialist again
14 and I told him, you know, nothing's
15 going on and that's when he told me,
16 he said well, I heard what happened
17 and I heard how you was asleep in your
18 cell and he came in and did that to
19 you. And then later on, I found out
20 that the Warden was bragging about
21 what he did to CO Baker, CO Leighty.
22      That's basically what happened
23 as far as it went. I mean, he was
24 just --- I mean, I've never seen him
25 that mad, the Warden, he was extremely

Sargent's Court Reporting Service, Inc.
(814) 536-8908

21

1  mad. That's basically what happened,
2  give or take, you know, that's
3  basically what happened.
4  Q.     Sure. Let me ask you more
5  specifics about that. The cell that
6  you were in, do you recall which cell
7  that was?
8  A.     Yes, it was on C Block --- C
9  Block, cell one, bottom bunk.
10 Q.     Can you describe how that cell
11 was laid out?
12 A.     When you walk into the cell, as
13 soon as you walk in, to the left is
14 the toilet, go like a step or two
15 more, to the right is the desk and
16 then the bunk back against the wall.
17 You got the bottom bunk, top bunk and
18 then the window runs down behind both
19 bunks.
20 Q.     I see. And you were on the
21 bottom bunk?
22 A.     Bottom bunk, yeah, and there's
23 a wall on each end, like where you lay
24 your feet, there's concrete and where
25 you lay your head is concrete.

22

1  Q.     So what would be your best
2  estimate of the dimensions of the
3  cell?
4  A.     How big it is?
5  Q.     Yes.
6  A.     It's hard to say. As far as
7  feet-wise, I don't know.
8  Q.     Well, best ---.
9  A.     Probably eight by ten,
10 something like that.
11 Q.     Eight by ten; okay.
12 A.     Give or take. I mean, I'm
13 just ---.
14 Q.     Approximately, I understand
15 that. So if you were standing up by
16 the bars to your cell ---
17 A.     Right.
18 Q.     --- and you're facing the bars,
19 you put your arms out to either side,
20 would it be possible to touch both
21 walls, or is it a little bit bigger
22 than that?
23 A.     I would probably it would be
24 safe to say that, because when you
25 come in, like I said, it's a

23

1  handicapped, so it's open more in the
2  middle and the toilet --- as soon as
3  you walk in, the toilet is right there
4  and the wall was right there, so I'd
5  probably say that's safe to say as far
6  as my recollection goes.
7  Q.     Okay. It's safe to say that
8  you could touch both walls or could
9  not touch both walls?
10 A.     I would say if there was any
11 point in that cell, that'd be the only
12 place you'd be able to touch both
13 walls with your arms extended, but
14 then once you go in, you don't have
15 the toilet there no more, then the
16 cell opened up more.
17 Q.     I see. So this was like a
18 handicapped accessible cell?
19 A.     Yes, it was.
20 Q.     And you say your cellmate's
21 name was Divelbiss.
22 A.     Divelbiss (corrects
23 pronunciation).
24 Q.     Divelbiss. Do you know how to
25 spell that?

24

1  A.     Yes, I do. It's
2  D-I-V-E-L-B-I-S-S.
3  Q.     His first name was what?
4  A.     Cory, C-O-R-Y.
5  Q.     Did you know Mr. Divelbiss ---
6  excuse me --- Divelbiss (changes
7  pronunciation) before you were his
8  cellmate at the Bedford County Jail?
9  A.     No, sir.
10 Q.     Have you spoken with Mr.
11 Divelbiss since you left the Bedford
12 County Jail?
13 A.     No, sir.
14 Q.     Do you have any written
15 statements from him or correspondence
16 or anything of that nature?
17 A.     Yes, I do.
18 Q.     What kind of correspondence do
19 you have or statements?
20 A.     I have what he witnessed.
21 Q.     Is it sort of like a written
22 paragraph type ---?
23 A.     Written up.
24 Q.     Okay. What time of day did
25 this incident occur?

25

1  A.    I'm not sure. It was either
2  before lunch or after lunch. It was
3  right around in that area.
4  Q.    Fair enough. And where was Mr.
5  Divelbiss --- am I saying it,
6  Divelbiss; is that correct?
7  A.    Divelbiss (corrects
8  pronunciation).
9  Q.    Divelbiss. Where was he
10 whenever the Warden was putting his
11 hands on you?
12 A.    The desk is up against the
13 right of the wall, so he was standing
14 like --- if that was the desk, he was
15 standing right here at the end of the
16 desk, so I mean, he was looking right
17 at it.
18 Q.    When Warden Orr came to the
19 cell, was he accompanied by any other
20 correctional officers or other
21 correctional people?
22 A.    No, sir.
23 Q.    Do you know why he was coming
24 to your cell that day?
25 A.    Assume to tell me to quit

26

1  writing the Bedford District Attorney
2  and the Huntingdon State Police
3  Barracks and then he told me, like I
4  said, he told me that, you know, he
5  would see that I would do life
6  regardless if I was innocent or not
7  and that the District Attorney would,
8  too. So I assumed that the District
9  Attorney might have had a little bit
10 of something to do with it, come in
11 there and get his point across.
12 Q.    So you were writing the
13 District Attorney's Office and the
14 State Police Barracks at Huntingdon?
15 A.    Yes.
16 Q.    And this is regarding some sort
17 of stolen property at your home?
18 A.    Yes.
19 Q.    Can you tell me about that?
20 What was happening?
21 A.    I was told by a friend of mine
22 that my father-in-law was down at my
23 house and was emptying it out after my
24 incarceration. He took whatever he
25 could haul, so I was trying to write

27

1  --- I wrote the District Attorney to
2  see, you know, what he was going to do
3  about this because I'm being held and
4  I wanted to know where my stuff was,
5  obviously, and he didn't respond and
6  then I wrote Huntingdon State Police
7  because that would have been our
8  police barracks where I lived and they
9  never responded, either.
10 Q.    So when you say Huntingdon
11 State Police, you mean the
12 Pennsylvania State Police Huntingdon
13 Barracks; is that correct?
14 A.    Yes.
15 Q.    Okay. Did anything ever come
16 of this incident with your father-in-
17 law taking things from your home?
18 A.    No.
19 Q.    Had you had any problem with
20 Warden Orr before that day?
21 A.    No.
22 Q.    Do you have any reason to
23 believe that Warden Orr had some kind
24 of connection either to your ex-wife
25 or your father-in-law?

28

1  A.    You mean my wife?
2  Q.    Excuse me, wife. My mistake.
3  A.    Not that I would --- not that I
4  know.
5  Q.    Do you know how Warden Orr
6  might have known that you were writing
7  to the State Police or the District
8  Attorney?
9  A.    Yeah, by the District Attorney.
10 Q.    So the District Attorney told
11 Warden Orr that you were writing the
12 District Attorney and to tell you to
13 stop?
14 A.    Yes.
15 Q.    Was this the same District
16 Attorney that was, at that time,
17 prosecuting you for the homicide?
18 A.    Yes.
19 Q.    That was District Attorney ---
20 A.    Bill Higgins.
21 Q.    --- Higgins. The homicide
22 prosecution, was it being handled by
23 the DA, himself, or did he have an
24 assistant district attorney working
25 for him?

29

1  A.  It was him.
2  Q.  Okay. You just told me earlier
3  that about 15 or 20 --- well, let me
4  back up for a moment first. So you
5  were asleep and the Warden was yelling
6  for you to get up and then was poking
7  you in the chest?
8  A.  Yes.
9  Q.  Were you laying down when this
10 poking was going on?
11 A.  Yes, yes.
12 Q.  Where was he poking you? Where
13 on your body?
14 A.  Right in the throat, like.
15 Q.  Sort of the sternum?
16 A.  Yes.
17 Q.  This side of the chest?
18 A.  Yes.
19 Q.  How long was that poking taking
20 place, do you think?
21 A.  I don't know, probably a dozen
22 times, anyhow, he was poking me. I'd
23 say at least a dozen times.
24 Q.  Was he saying anything to you
25 whenever he was poking your chest?

30

1  A.  Yeah, he was telling me to wake
2  up.
3  Q.  And then I think you said he
4  grabbed you by the throat?
5  A.  Right.
6  Q.  That was when you were laying
7  down, too?
8  A.  Yes.
9  Q.  Were you on your back at that
10 time or on your side?
11 A.  Yes, I was on my back.
12 Q.  Okay. And then he started to
13 bang your head?
14 A.  Uh-huh (yes).
15 Q.  Okay. He was banging your head
16 off of what?
17 A.  The concrete wall that was
18 right behind the bunk. As soon as you
19 walk into the cell, it's up against
20 the concrete and then there's concrete
21 at both ends.
22 Q.  How many times, if you know, do
23 you think your head bounced up against
24 the concrete wall?
25 A.  I'm not sure. I'm not sure the

31

1  amount. I know it seemed like a lot,
2  you know, but I'm not sure as far as a
3  number. Many times.
4  Q.  How long do you think those
5  whole --- let's call it an incident
6  --- between you and Warden Orr lasted?
7  A.  Like I said, I was half asleep
8  whenever he started, you know, poking
9  me in the chest so again, I'm not even
10 sure on how long, you know. I was
11 half asleep and then when I came to,
12 he was still doing what he did, so I'm
13 not really sure. Sometimes when bad
14 things happen, it seems like it's
15 longer than what it is and you know,
16 I'm not really sure.
17 Q.  Sure. So after the incident
18 ended, then the Warden left?
19 A.  Yes.
20 Q.  And Cory had left before that?
21 A.  Cory just stepped outside the
22 cell. He didn't really go nowhere.
23 He stepped outside the cell, but he
24 could still see in there.
25 Q.  After the Warden left, what

32

1  happened next? Did Cory come back in?
2  A.  Yeah, he come back in. He just
3  said, you know, man, that's bullshit,
4  he said, him doing that to you. He
5  said you didn't even do nothing to
6  him, you were sleeping, he said, you
7  know, I was standing right there and
8  you didn't provoke it or say anything.
9  He said you didn't say a word to him
10 regardless when he started or ended.
11 So yeah, he seen it all.
12 Q.  Do you recall saying anything
13 to Cory?
14 A.  I just told him that, you know,
15 like whenever something hits you or
16 whatever, you see stars, you know.
17 I'm sitting there talking to --- I sat
18 down on the bed after I sat up and I
19 was seeing like stars and like
20 lightheaded and Cory said yeah, he
21 said, I seen him pounding your head
22 against the wall. I said yeah, I said
23 I don't know what the heck that was
24 all about and then I sat there for a
25 couple minutes. I said he was saying


**Page 33**

something about not writing the DA or the police station no more. Cory said yeah, he was just going off and I said yeah, I know.

Q. And 15 or 20 minutes later, the treatment specialist came by to see you?

A. No, I seen him coming down the corridor, the walkway, and I motioned for him to come in. I wanted to speak to him about the incident and that's when he came into the block and seen me.

Q. What's the treatment specialist's name, if you recall?

A. Mr. Downy.

Q. Downy; okay. What did Mr. Downy --- what was his job function there as a treatment specialist? What types of things would he do?

A. I'm assuming that it was like treating you for dependencies and things or trying to get you prepared to go back out on the street or, you know, I'm not real clear on exactly

**Page 34**

what his position was.

Q. Had you had any interaction with Mr. Downy before that day?

A. As far as like a ---?

Q. Well, for example, was he giving you any sort of treatments or counseling or anything of that nature?

A. No, no, we just talked like in passing or if he come on the block, you know, we'd say hello to each other and stuff like that, but, no.

Q. Now, speaking of which, when you would receive your medicine to help you rest, how were meds passed out there in the Bedford County Jail?

A. The nurse comes to the block and where the slider door is where they come in and off the block, the doors close and there's a lid that they unlock and the lid folds down and then you stand in line for your medication and they hand it through a little compartment door to you.

Q. Is that a nurse that hands it to you?

**Page 35**

A. Yes.

Q. How often do you take this medication?

A. I know it was at nighttime for sure. I don't know because I had ones before in the middle of the afternoon, late afternoon and then at night, so I think it was just at nighttime at that time.

Q. So just one time a day?

A. Yeah, I'm pretty sure.

Q. And they'll give you, I guess, I assume, one dose of the medicine?

A. Yes.

Q. Was it in a pill form or liquid or ---?

A. Pill form.

Q. Pill form. And that rest medication was the only thing you were taking at that time?

A. As far as I know, because I tried to get some medical records so I would know for sure. So I'm going to say that I assume it was, but I'm not 100 percent sure.

**Page 36**

Q. You actually reminded me. Mr. Gerholt, I brought you two authorizations. What these things are for is so we're able to get your medical records. I'll receive them, we're on record here, and I'll give you copies of everything that I receive. So if you could sign the authorizations, I will get the records where you'll be able to see.

A. Well, how about if I try to get them first, that way ---? Because right now, as it stands, I'm trying to get representation for this case.

Q. Uh-huh (yes).

A. So I would sooner me try to get them first and then ---.

Q. I understand that, however your medical condition is at issue. I understand you're alleging now that as a result of this, you're having headaches and problems with your neck and other ---.

A. I mean, if it's mandatory, I'll sign it.

37

1  Q.    It is mandatory, so ---.
2  A.    Okay. That's what I was
3  saying. I mean, if it's mandatory,
4  I'll sign it.
5  Q.    I appreciate that.
6  A.    You know, if you're saying that
7  I have to, regardless, then I'll sign
8  it.
9  Q.    Sure. And when I get copies, I
10 will have a copy made for you and I'll
11 give you a copy of everything that I
12 receive.
13 A.    So you're saying since this is
14 part of the case, then I have no
15 choice, I have to sign it?
16 Q.    Yeah, it's discoverable because
17 you placed your medical condition at
18 issue.
19 A.    Okay. I'm just making sure.
20 Q.    Sure. Thank you. And for the
21 record, I handed Mr. Gerholt a copy of
22 two authorizations which he signed.
23 Thank you.
24       So from your complaint, it
25 appears that Prime Care Medical is the

38

1  healthcare provider at the Bedford
2  County Jail at that time?
3  A.    Yes.
4  Q.    Did you speak with any of the
5  nurses or physicians there about any
6  injuries you may have sustained in
7  this incident?
8  A.    Yes, I did.
9  Q.    Can you tell me about that,
10 please?
11 A.    I just went down to their
12 office, like I said previously, and
13 said a little bit in brief about what
14 happened and they gave me some pain
15 medicine because I was having a
16 headache then and told me to just
17 follow it up and I told them, you
18 know, like I said, what happened and
19 they said they'd just follow-up on it.
20 That was basically it.
21 Q.    How did they follow-up with it?
22 A.    Give me some more pain
23 medicine, some Tylenol or ibuprofen or
24 whatever it was. Like I said, there
25 was --- a lot of the employees there

39

1  are scared of Mr. Orr. A lot of
2  employees lost their jobs, a lot of
3  employees were fearful they was going
4  to lose their jobs and I mean, you
5  know, he fired a lot of people. A lot
6  of people were afraid to go against
7  him for fear of losing their job.
8  Q.    Did any of the nurses or Prime
9  Care doctors tell you that they
10 weren't going to treat you because
11 they were afraid of Mr. Orr?
12 A.    No, they didn't say they was
13 and they didn't say they wasn't, you
14 know. They just gave me some pain
15 medicine, you know, for headaches and
16 stuff and left it go at that. I mean,
17 obviously, they thought that they
18 couldn't do nothing other than that,
19 you know, for the incident.
20 Q.    Do you recall whether or not
21 the Bedford County Jail had a Prime
22 Care physician that was at the jail
23 let's say on staff, there on a regular
24 basis?
25 A.    They had nurses there. I don't

40

1  know --- I mean, they was there that
2  day, but I don't know what their
3  schedule was, if they have around the
4  clock, you know, or specifically who's
5  on call or something like that there,
6  but it was just the same nurses that
7  you see on a daily basis.
8  Q.    Do you recall any of those
9  nurses' names?
10 A.    One was Nurse Kim, Nurse
11 Michelle. I don't know if anybody
12 else was there that day or not, but I
13 mean, them was the two nurses that's
14 regularly there, so ---.
15 Q.    Were you ever sent to a
16 hospital for any sort of evaluation of
17 your injuries that you might sustain
18 during this incident?
19 A.    No. They don't like sending
20 you nowhere.
21 Q.    What about after you --- well,
22 my understanding is that your first
23 stop after leaving the Bedford County
24 Jail was SCI Camp Hill?
25 A.    Yes.

41

1  Q.    When you went to SCI Camp Hill,
2  they gave you a medical evaluation;
3  right?
4  A.    Yes.
5  Q.    Did they give you any sort of
6  testing of any kind for any injuries
7  you might have sustained during this
8  incident?
9  A.    I mentioned it to them and they
10 said that they have a regular test and
11 stuff that they do automatically, a
12 medical evaluation, because you're on
13 R block and you got like your
14 automatic medical lockdown, but I had
15 mentioned it to them in brief what
16 happened previously.
17 Q.    Did they give you any sort of
18 x-rays or MRIs or anything of that
19 nature to check your neck or
20 shoulders?
21 A.    I think they gave everybody ---
22 is it the MRI that they put the little
23 sticky cups on you and plug you in or
24 something like that?
25 Q.    I'm not a doctor, but I believe

Sargent's Court Reporting Service, Inc.
(814) 536-8908

42

1  that's called an EKG.
2  A.    Okay. I know they did that,
3  but again, I'm not sure what all they
4  did. I'm assuming it would be in the
5  medical records.
6  Q.    Okay. Are you getting any sort
7  of medical treatment for any injuries
8  you sustained there during this
9  incident here at Graterford?
10 A.    Yes.
11 Q.    What type of treatments are you
12 getting?
13 A.    I had a head x-ray because I
14 still have a sore spot on my head,
15 it's sore to the touch, and I don't
16 know what it is. I've had a couple of
17 different x-rays. I'm seeing the ---
18 again, I'm not a doctor, either ---
19 someone that does psych evaluations on
20 you and stuff, like a trauma thing. I
21 see them and just various things. I
22 mean, I'm still taking, you know, pain
23 meds and whatnot to this day, so I'm
24 still treating up on it, but as far as
25 when or how much or whatever would be

Sargent's Court Reporting Service, Inc.
(814) 536-8908

43

1  in the medical records.
2  Q.    Okay. And when you say pain
3  medicine, you told us earlier about
4  ibuprofen and Tylenol and that type of
5  thing. Is that what you mean or is
6  there some sort of stronger
7  medication?
8  A.    No, I'm assuming, again, that
9  that's all they give me because, you
10 know, they was giving me different
11 medications to fluctuate and try to
12 figure the best policy, I'm assuming,
13 so I'm not real sure on the medicine
14 steps that we've come to today.
15 Q.    And that will probably be clear
16 in the medical records so I guess
17 we'll see what they have in there.
18       Okay. You were telling us
19 earlier that after the incident, Mr.
20 Downy told you that you should write a
21 complaint, but that you should wait
22 until Mr. Orr left?
23 A.    Right.
24 Q.    Okay. And the complaint, as I
25 understand it, you wanted to speak

Sargent's Court Reporting Service, Inc.
(814) 536-8908

44

1  with the State Police?
2  A.    Yes.
3  Q.    Okay. How did you go about
4  requesting seeing the State Police?
5  For example, was that a request slip
6  or a grievance for something like
7  this?
8  A.    It was a written request slip.
9  I'm not sure what the, you know,
10 number of the request is, but they
11 make them ready and available and I
12 filled it out for the shift commander.
13 Q.    In your complaint, you mention
14 a Lieutenant Clipper. Is that the
15 shift commander?
16 A.    Clapper.
17 Q.    Clapper, C-L-A-P-P-E-R?
18 A.    I think it's C-L-A-P-P-E-R;
19 Clapper.
20 Q.    So the request slips were
21 readily available on the block?
22 A.    Yes.
23 Q.    And you filled one out asking
24 to speak with the State Police?
25 A.    Yes.

Sargent's Court Reporting Service, Inc.
(814) 536-8908

46

```
 1  Q.    Did you and Lieutenant Clapper
 2  speak about the incident any other
 3  times? If you recall.
 4  A.    I don't recall. Now that I
 5  think of it, I did put that in the box
 6  because the Lieutenant wouldn't hand
 7  take it, he said it had to be put in
 8  the box.
 9  Q.    Okay. I think you mentioned
10  earlier that nothing came of putting
11  that request up?
12  A.    I didn't hear nothing until
13  around October 15th when I was at SCI
14  Camp Hill and a trooper came to see me
15  in regards to that, but that was, like
16  I said, in or around October 15th.
17  That was after I got out of the County
18  Jail.
19  Q.    When you left the County Jail
20  and you went to SCI Camp Hill, did you
21  make any requests at Camp Hill asking
22  to see the State Police about the
23  incident?
24  A.    Well, they wouldn't let us see
25  nobody, until we was done being
```

47

```
 1  medically cleared, so I mean, we
 2  wasn't allowed to use the phone, we
 3  didn't have an ID number to write
 4  anybody, so everything, according to
 5  the unit manager that was on R block,
 6  you know, you got to wait until you
 7  get medically cleared and moved on
 8  another block before you can do
 9  anything.
10  Q.    I see. Do you believe that ---
11  and I guess you wouldn't know this,
12  but I'm just asking about your belief
13  --- the reason that the State Police
14  came to see you in October of 2012 was
15  a result of filing the request slip
16  earlier that year asking to see the
17  police about the incident?
18  A.    Yeah, it was in regards to it.
19  Yes.
20  Q.    Okay. We'll get to that, I
21  guess, in a couple of minutes. Let's
22  stay focused on while you were still
23  at the Bedford County Jail. Did you
24  have any other interactions with
25  Warden Orr from May 15th, 2012 until
```

48

```
 1  you left in ---?
 2  A.    As far as confrontations?
 3  Q.    Conversations, confrontations,
 4  any sort of interaction with him
 5  whatsoever?
 6  A.    No, he wasn't a conversation
 7  person.
 8  Q.    I see.
 9  A.    He was always on a mission in
10  his mind. It was best just to stay
11  out of his path.
12  Q.    What was the grievance process
13  at the Bedford County Jail?
14  A.    You just fill out a grievance,
15  you send it in and you wait until they
16  feel like responding back. If they
17  don't, it just mysteriously disappears
18  and they send it back and tell you,
19  you know, what their plans of doing
20  whatever it is to answer the
21  grievance.
22  Q.    Okay. When a person who's an
23  inmate files a grievance, who hears
24  the grievances?
25  A.    I was always under the
```

49

```
 1  impression that the Warden did.
 2  Q.    I see. Did you file a
 3  grievance about Warden Orr while you
 4  were at the Bedford County Jail?
 5  A.    In regards to this?
 6  Q.    Yes.
 7  A.    No, because just like I said, I
 8  assumed that the Warden answered them
 9  and it would just be a waste of time,
10  he'd just throw it away.
11  Q.    I understand. Do you remember
12  --- going back to the date of the
13  incident, May 15, 2012, do you recall
14  if there were any correctional
15  officers who were on the block
16  whenever the incident between you and
17  the Warden was taking place?
18  A.    No, he was on there by himself.
19  Q.    Other than with --- well,
20  again, just to be clear, I'm focusing
21  on the incident that was on May 15,
22  2012 and you left the jail on August
23  21, 2012?
24  A.    I left the jail on September
25  11th of 2012.
```

**50**

1  Q.  Thank you for that correction.
2  During that period of time, did you
3  discuss the incident with any
4  correctional officers or officials
5  other than Mr. Downy and Mr. Clapper?
6  A.  CO Baker and CO Leighty came to
7  me when I was out in the booking area
8  changing out --- when you go places,
9  like if you go to church, some of them
10 get picked to come back and change
11 out, you know, just various things,
12 and they both told me that he was ---
13 that Mr. Orr was bragging up how he
14 set me straight.
15 Q.  Baker is B-A-K-E-R?
16 A.  Yes.
17 Q.  And Leighty appears to be
18 L-E-I-G-H-T-Y.
19 A.  I'm not positive on that.
20 Q.  Okay.  Did Officer Baker or
21 Officer Leighty tell you anything else
22 about the incident?
23 A.  They just told me that he was
24 bragging about how he supposedly set
25 me straight.

Sargent's Court Reporting Service, Inc.
(814) 536-8908

**51**

1  Q.  Did you discuss the incident
2  with Baker and Leighty at the same
3  time?
4  A.  No.
5  Q.  Different times?
6  A.  Yes.
7  Q.  This was close in time after
8  the incident?
9  A.  Yes.
10 Q.  Would you say within the same
11 week or maybe later than that?
12 A.  I'm not sure.
13 Q.  Had you witnessed Warden Orr
14 being violent with any other inmates?
15 A.  He hollered and screamed at a
16 lot of people, you know, just wanted
17 to put out there that intimidation
18 that, you know, I'm the Warden, nobody
19 messes with me or there will be strict
20 consequences.  Like I said, we heard
21 about him firing many of the COs, a
22 lot of them was women, and the COs
23 that was still working there was
24 scared to say anything about him for
25 fear they'd lose their job.  He was

Sargent's Court Reporting Service, Inc.
(814) 536-8908

**52**

1  running wild there for a while.
2  Q.  So he would yell at people, but
3  you didn't see any other physical
4  violence with anyone?
5  A.  No, just verbal.
6  Q.  Had any of the other inmates
7  told you that he had been physically
8  violent with them?
9  A.  Not that I recall.
10 Q.  Let's talk for a moment about
11 the State Police investigation.  I
12 think from your complaint, it said
13 that occurred in October of 2012?
14 A.  Yes.
15 Q.  Would you have been in Camp
16 Hill at that time?
17 A.  Yes.
18 Q.  Okay.  Tell me what you
19 remember from that State Police
20 investigation.
21 A.  I was given a pass.  I was on,
22 I believe it was A block and was told
23 to go down where they do the DNA test
24 and I went down there and Trooper
25 Jeremy Matas, I believe it was, from

Sargent's Court Reporting Service, Inc.
(814) 536-8908

**53**

1  the State Police out of Carlisle, he
2  come and just in brief asked me about
3  the assault and we talked briefly and
4  he told me it was an ongoing
5  investigation and that he would be in
6  contact with me at some point in time
7  and that was basically it.  He left
8  and I never heard nothing from him
9  since.
10 Q.  Have you talked to any other
11 State Police Troopers or Officials
12 about the incident?
13 A.  Outside of Bedford Jail?
14 Q.  Yes.
15 A.  No, the only people I talked
16 about was like the medical at Camp
17 Hill and medical here and doctors
18 here.
19 Q.  Do you know if this
20 investigation that Trooper --- is it
21 Matas?
22 A.  Matas, as far as I can see.
23 Q.  Okay.  It looked like it was,
24 M-A-T-A-S, in your complaint?
25 A.  Yes.

Sargent's Court Reporting Service, Inc.
(814) 536-8908

54

Q. Do you know if Trooper Matas' investigation is still ongoing?
A. I have no idea.
Q. But you haven't spoken to Trooper Matas again since then?
A. No, just before he left, he just said it was an ongoing investigation.
Q. Did you have to give any sort of written statement, recorded statement of some type to Trooper Matas?
A. No.
Q. It was all sort of oral report?
A. Yes.

OFF RECORD DISCUSSION

BY ATTORNEY LETTRICH:
Q. Do the inmates raise food here at Graterford? Is there a farm?
A. I don't think.
Q. No? I was under the impression that there was, but I could be mistaken.
A. Right. I think years ago, there was, but I'm not sure if they

55

have that going on now or not.
Q. I see. Okay. So going back to the incident, you said that Warden Orr told you that if you didn't stop writing the DA and the State Police, that he and the District Attorney would make sure that you spent the rest of your life in prison, whether or not you were guilty?
A. Yes.
Q. Do you believe or do you have any information that there's any sort of relationship between DA Higgins and Warden Orr? For example, are they friends or why do you think ---?
A. At that time, they were.
Q. Okay.
A. At that time, they were, you know. I guess Higgins would be his boss so to speak, you know, and Mr. Downy even told me. He said you know, them two are thick, you know. They've been buddy/buddy since he worked for him and stuff, so I just assumed that they were.

56

Q. Do you think that that's why Warden Orr made that statement?
A. I'd say that's a strong yes, you know what I mean? I would say that that was definitely the deciding factor as far as him coming in there after me.
Q. Okay. And you never had a problem with Warden Orr before that day; is that correct?
A. No, sir.
Q. So isolated to one day, May 15, 2012?
A. As far as him retaliating on me?
Q. Yes.
A. Yes.
Q. What about District Attorney Higgins? Other than the fact that he was prosecuting you, did you and he have any problems with one another? Like for example, did you feel like he had it out for you in some respect?
A. I'd say yes. He badgered me from day one in the media, so yeah, he

57

wasn't open for any discussions of --- you know, at that point in time, he could care less of exactly what happened at either place, you know, where the alleged crime took place outside the prison and then until the day Mr. Orr attacked me. He was continuously battering me.
Q. When you say the alleged crime outside of prison, you're referring to the incident with your father-in-law and the property at your home?
A. I would say that and the criminal charges that were filed against me.
Q. The prosecution you were facing at that time?
A. Yes.
Q. I'm bouncing around here a little bit and I apologize for that, but going back to the incident. You said that your cellmate, Cory, witnessed the incident and that there wasn't anybody else with Warden Orr. Do you know if anybody else witnessed

---

58

1  this accident? For example, do you
2  know of any other, perhaps, inmates or
3  anybody else that might have been
4  nearby or anything of that nature?
5  A.      There was other inmates, but I
6  don't recall who they were, said that
7  they heard the commotion that was
8  going on and how he was down there
9  screaming and hollering at me.
10 Q.     Okay. According to your
11 complaint, you wrote a letter on May
12 18, 2012 to the County Commissioners
13 about the incident?
14 A.     Yes.
15 Q.     Okay. Can you tell me a little
16 bit about that?
17 A.     Well, I wasn't getting nowhere
18 inside the prison as far as trying to
19 talk to State Police or, you know, so
20 I wrote to the Bedford County
21 Commissioners and they didn't even
22 bother to write me back one way or the
23 other. They didn't reply.
24 Q.     Do you still have a copy of
25 that May 18th letter?

---

59

1  A.      I wouldn't bet my life on it,
2  but I may have it. If I don't, my
3  mother-in-law would, because when I
4  left the prison, I had to pack my
5  stuff up and have someone come pick it
6  up because you ain't allowed to take
7  so much stuff to Camp Hill with you.
8  I'm pretty sure, though, I could find
9  it.
10 Q.     So you have a statement from
11 your cellmate, Cory, about what
12 happened, you may have a copy of this
13 May 18, 2012 letter with your mother-
14 in-law.
15 A.     Yes.
16 Q.     Do you have any other sort of
17 records or documents about this
18 incident or about any injuries
19 sustained during the incident, other
20 than those two things?
21 A.     I have written diaries that I
22 was keeping of events that was going
23 on throughout the jail and stuff like
24 with me, you know, if I went to court,
25 if I seen my attorney that day, you

---

60

1  know, if I seen a fight on the block,
2  I'd log it in and stuff. So I have
3  daily diaries, you know, I can
4  reference, too.
5  Q.      Are those also with your
6  mother-in-law?
7  A.      If I don't have them, she does.
8  Q.      All right. From reading your
9  complaint, you indicated that you
10 pleaded no contest on August 21, 2012
11 and I believe you said that you were
12 forced into signing it by District
13 Attorney Higgins and your court
14 appointed attorneys.
15 A.     Yes.
16 Q.     Can you explain what you meant
17 by that?
18 A.     Well, my attorneys told me that
19 if I took my case to trial, that Judge
20 Ling, he was the --- he's a judge in
21 the same courthouse, but he handled
22 --- he was like family court at that
23 time, that he told them that if I took
24 my case to trial, that he'd personally
25 see that I'd never get to see my

---

61

1  children again, my youngest children
2  and also if my mother-in-law took the
3  stand on my defense, that he would see
4  personally that she wouldn't get to
5  see her grandchildren again either and
6  as of today, that's true. However,
7  even though I took the no contest
8  plea, he didn't make good on his. And
9  my attorney, my lead attorney promised
10 to do my custody case for me. He
11 promised to do a civil action quiet
12 title case for me and there was a
13 couple other things, as well as him
14 telling me personally that we couldn't
15 win the case. So I mean, I had no
16 confidence in him at all at that point
17 when he told me, you know, we do not
18 have a chance of winning this case.
19      That's whenever I was in there
20 and Mr. Higgins come in. I told him,
21 I said, you know, this wasn't
22 intentional. This was an accident and
23 he said I don't care one way or the
24 other, you know, he was just out for a
25 conviction. So they came up with the

Page 62

```
 1  no contest plea.  It's not pleading
 2  guilty, it's not say you ain't guilty
 3  and so that's how that was.  Mr.
 4  Higgins said that he would do his
 5  damnedest to ruin my son's military
 6  career, even if he had to drag him
 7  back from out of state to testify in a
 8  homicide case.
 9        So it was kind of like
10  everything was weighing on me and my
11  attorney, you know, was bailing out on
12  me to save his reputation and whatnot,
13  so that's the gist of it, you know.
14  Q.    Who was your court-appointed
15  attorney at that time.
16  A.    It was Attorney Dickey and
17  Attorney Beyer.
18  Q.    I assume that these two
19  attorneys are not representing you in
20  your PCRA petition?
21  A.    No, I fired both of them.
22  Q.    Was there a Judge Howsare
23  involved in this ---?
24  A.    Howsare (changes
25  pronunciation).
```

Page 63

```
 1  Q.    Howsare.
 2  A.    He's doing my criminal case.
 3  Q.    Okay.  Did you discuss the
 4  incident with Warden Orr with either
 5  Judge Ling or Judge Howsare?
 6  A.    I wrote them all numerous times
 7  with various situations, but then, you
 8  know, again, if they feel like writing
 9  back, they do, if not, it mysteriously
10  just disappears.  They have a way with
11  that in Bedford.  If they don't want
12  to answer something one way or the
13  other, it just goes unanswered.
14  Q.    So you have now --- you
15  reported this incident to Lieutenant
16  Clapper, reported this to the
17  Pennsylvania State Police and the
18  County Commissioners.
19  A.    No, I didn't get through to the
20  Pennsylvania State Police until they
21  came on October 15th.
22  Q.    Right.
23  A.    But that was out of Carlisle.
24  That wasn't Bedford.
25  Q.    Right.  But you had spoken with
```

Page 64

```
 1  the State Police regarding this
 2  incident?
 3  A.    Yes, when they came to see me
 4  in regards to this situation.
 5  Q.    Okay.
 6  A.    Have you reported the incident
 7  to anybody else or discussed the
 8  incident with any other officials?
 9  For example, Department of Corrections
10  or any Federal officials?
11  A.    Just the medical at SCI Camp
12  Hill and the medical here.
13  Q.    Okay.  You never had any
14  conversations with any officials from
15  the Pennsylvania Department of
16  Corrections about Warden Orr?
17  A.    You ever see Camp Hill, you'll
18  see why you don't say nothing to
19  people.  They scream at you even if
20  you ain't speaking.  No, I just spoke
21  to all medical staff.
22  Q.    Okay.  I'm just trying to
23  understand whether, you know, whether
24  there might be records or other
25  information.  So you didn't speak to
```

Page 65

```
 1  any Federal authorities, for example,
 2  the U.S. Attorney's Office or the
 3  Department of Justice?
 4  A.    No.  I did try to file a --- I
 5  wrote Judge Ling about --- let's see
 6  --- about wanting to file a suit
 7  against I think it was either Bedford
 8  or Orr and he wrote me back declining
 9  saying there was no forms for any
10  complaint like that, trying to brush
11  me off so I wouldn't pursue nothing.
12  Q.    I think you talked about this a
13  little bit, but I'd just like to kind
14  of get a little bit more detail.  That
15  would be the medical treatment that
16  you're receiving here at Graterford;
17  okay?  You were transferred here on
18  November 9th, 2012; is that correct?
19  A.    That's safe to say, yes.
20  Q.    Okay.  What kind of medical
21  treatment, if anything, are you
22  getting for --- you mentioned some
23  headaches that you had after this.
24  Are you getting any treatments for
25  headaches?
```

66

1  A.    Well, they give you the wonder
2  drug here, ibuprofen.
3  Q.    Are you getting any sort of
4  treatments or physical therapy for any
5  injuries to your neck or shoulders?
6  A.    I don't think they have any
7  therapy here.
8  Q.    And you mentioned you were
9  seeing a psychiatrist here for trauma?
10 A.    Yes.
11 Q.    Okay.  According to the
12 complaint, your psychiatrist's name is
13 Bratton, B-R-A-T-T-O-N; is that
14 correct?
15 A.    Here?
16 Q.    Yes.
17 A.    I'm not sure because you might
18 see one one time and see somebody
19 else, you know, so I'm not sure if
20 that's him or not.
21 Q.    Okay.  The trauma that you're
22 seeing a psychiatrist for here at
23 Graterford, is that related
24 specifically to the incident with Mr.
25 Orr or is that trauma generally, for

Sargent's Court Reporting Service, Inc.
(814) 536-8908

67

1  example, the trauma of being
2  incarcerated, the trauma of the
3  homicide, the trauma of the issues
4  with the District Attorney, with your
5  counsel and all that kind of ---?
6  A.    It's hard to say because when
7  they talk to you about something, they
8  like to ball it all into one so to
9  speak, so I don't know how they
10 separate it or anything like that
11 there.  You get a limited time with
12 them.  You don't get much time with
13 them, so as they're asking you
14 questions, they're putting things
15 together, so you don't know what, you
16 know, how they're wrapping it all up.
17 Q.    So you sort of discuss a lot of
18 different issues and they decide how
19 they feel about certain issues?
20 A.    Yes.
21 Q.    Did they ever give you a
22 diagnosis of any sort?  Did they ever
23 diagnose you with any conditions, that
24 you're aware of?
25 A.    No, they don't like giving you

Sargent's Court Reporting Service, Inc.
(814) 536-8908

68

1  no paperwork there.  They don't want
2  you to have nothing on record in your
3  hands so to speak.
4  Q.    Uh-huh (yes).  But for example,
5  we have that condition PTSD, post-
6  traumatic stress disorder we hear
7  about soldiers experiencing.  Is what
8  they're treating for something like
9  that or is it something different?
10 A.    It's hard to ---.
11 Q.    If you know.
12 A.    Yeah, it's hard to explain how
13 they --- things are done different
14 here than on the street, per se, you
15 know.  So it's kind of hard to say how
16 they categorize stuff.
17 Q.    Fair enough.  Looks like you've
18 been back to Bedford County on a
19 couple of occasions for PCRA hearings.
20 A.    Yes.
21 Q.    Whenever you go back to Bedford
22 County for PCRA hearings, are you
23 housed in the Bedford County Jail?
24 A.    That depends.  One time, I was;
25 the second time, I wasn't; then this

Sargent's Court Reporting Service, Inc.
(814) 536-8908

69

1  last time, I was.  So it just depends
2  on what the Sheriff's Department's
3  schedule as far as transportation is.
4  So it's at their discretion.
5  Q.    On the instances where you came
6  back to the Bedford County Jail after
7  having arrived here at Graterford,
8  have you had any other problems at the
9  Bedford County Jail?
10 A.    No.
11 Q.    Have you had any other
12 discussions with any Bedford County
13 Jail officials about the incident with
14 Warden Orr?
15 A.    I believe the first time I was
16 back was January 15th, 2013, Baker and
17 Leighty both reminisced a little bit
18 on it, you know.  They seen me and
19 stuff, wanted to know how I was doing
20 and whatnot and was telling me again,
21 you know, how Warden Orr boasted and
22 bragged about what he did to me.
23 Q.    Do you recall anything else
24 about those conversations in January
25 2013 with Officer Leighty or Officer

Sargent's Court Reporting Service, Inc.
(814) 536-8908

**70**

1  Baker?
2  A.   No, I don't recall.  Just a lot
3  of small talk.
4  Q.   I understand.  Again, this is
5  all from reading your complaint, you
6  mentioned you were having problems
7  with quivering, throat and breathing
8  problems.
9  A.   Uh-huh (yes).
10 Q.   Can you tell me what you meant
11 by that?
12 A.   At times, my arms will be like
13 shaking like they are a little bit now
14 and without even thinking about, you
15 know, shaking.  Then there's times
16 like when I lay down, I'll have panic
17 attacks, you know, like doze back into
18 like a sleep dream, you know, like see
19 someone coming up on you and you jump
20 like that there.  I have a lot of
21 anxiety and chest pains, as well.
22 Q.   So it's the nightmares and the
23 quivering, throat and breathing
24 problem are all kind of related with
25 one another?

**71**

1  A.   Yes.
2  Q.   And related to panic or
3  anxiety?
4  A.   Yes, you know, like flashbacks
5  and things like if I dream like at
6  night or whatever.  I've dreamt
7  already where he was coming in the
8  cell, you know, and grabbing ahold of
9  me and I'd wake up like in a cold
10 sweat.  As far as like neck pain and
11 back pain is on a daily basis.
12 Q.   Your complaint mentions a
13 concussion.  Were you ever diagnosed
14 with a concussion?
15 A.   They told me that it was quite
16 possible that I had one, but then
17 again, they run their tests how they
18 do them here, you know, Camp Hill and
19 here, so you know.  Like I said, I
20 still have a sore spot to the touch on
21 the side of my head where I got
22 wrapped up against the wall and, you
23 know, I'll be honest with you, as an
24 inmate here, we don't get the best of
25 treatment.  I mean, we get what we get

**72**

1  and that's the end of the day, so I
2  mean, you just have to learn to deal
3  with stuff.
4  Q.   So to describe where you're
5  pointing on your head, it appears to
6  be on the right side of your head?
7  A.   Yes, like right ---.
8  Q.   Towards the top, sort of behind
9  your ear?
10 A.   Yes, soft spot there because
11 whenever he come in the cell, you got
12 to look this way.  The doorway there
13 to my right is how it was to the cell,
14 so I'm laying in bed and look this way
15 and whenever he had ahold of me
16 hitting my head, it was in the back
17 and on the right hand side.
18 Q.   So the spot you were
19 describing, that's where your head was
20 touching the wall?
21 A.   Yes, yes.
22 Q.   I think that's more or less the
23 things that I wanted to know about
24 your lawsuit.  Let me ask you this.
25 We talked about a lot of things here

**73**

1  today.  Is there anything else you
2  think is important to your lawsuit
3  that we didn't touch on here today?
4  Any other important facts or witnesses
5  or anything of that nature?
6  A.   I don't really think there is.
7  I mean, other than I was trying my
8  darndest to try to find an attorney,
9  but since you're incarcerated, nobody
10 wants to take the case.  So I've been
11 trying to, you know, remember
12 everything that went on so it would
13 be, you know, pretty clean and I think
14 everything went all right as far as
15 today goes, you know.
16 Q.   Okay.  Sometimes when we talk
17 about issues, it will jog your memory
18 about something else.  After having
19 thought about it and talked about
20 other issues, is there anything you
21 want to add to any of your answers
22 from anything we've talked about here
23 today?
24 A.   No, I think you got everything
25 straightened out as far as questions

74

1  go.
2  Q.    Okay.  Very good.  What I'm
3  going to do is I will take these
4  authorizations and I will get them to
5  the prison officials, request copies
6  of your records.  I will make a copy
7  for me and a copy for you.  I'll send
8  you a copy of that.  I may wind up
9  trying to check into some other
10 records and I'll give you copies of
11 whatever I have so that your file is
12 complete.
13 A.    Okay.  And like you said, I
14 mean, it was mandatory I signed them,
15 so ---.
16 Q.    Yes.  Uh-huh (yes).  Because
17 your medical condition is at issue.
18 A.    Okay.
19 Q.    That's the reason.  You know,
20 we need to be able to see, you know,
21 how your medical condition is because
22 you're alleging that you're hurt and
23 that's the reason for it.  In the
24 event that you get a lawyer,
25 obviously, have him give me a call, in

Sargent's Court Reporting Service, Inc.
(814) 536-8908

75

1  which case I'll deal with him
2  directly, as opposed to you.
3  A.    Right.
4  Q.    But otherwise, I'll copy you on
5  everything, as well.
6  A.    Okay.
7  Q.    Okay.  Thank you, Mr. Gerholt.
8  I appreciate it.
                * * * * * * * *
10    DEPOSITION CONCLUDED AT 11:34 A.M.
                * * * * * * * *

Sargent's Court Reporting Service, Inc.
(814) 536-8908

76

1  COMMONWEALTH OF PENNSYLVANIA  )
2  COUNTY OF BERKS               )
3
4            CERTIFICATE
5        I, Jennifer D. Crawford, a Notary
6  Public in and for the Commonwealth of
7  Pennsylvania, do hereby certify:
8        That the witness whose testimony
9  appears in the foregoing deposition, was duly
10 sworn by me on said date and that the
11 transcribed deposition of said witness is a
12 true record of the testimony given by said
13 witness;
14       That the proceeding is herein recorded
15 fully and accurately;
16       That I am neither attorney nor counsel
17 for, nor related to any of the parties to the
18 action in which these depositions were taken,
19 and further that I am not a relative of any
20 attorney or counsel employed by the parties
21 hereto, or financially interested in this
22 action.
23                              [Signature]
                                 Court Reporter
24  COMMONWEALTH OF PENNSYLVANIA
    NOTARIAL SEAL
25  JENNIFER D. CRAWFORD, Notary Public
    Reading, Berks County, PA
    My Commission Expires May 17, 2016

Sargent's Court Reporting Service, Inc.
(814) 536-8908