# EXHIBIT B

1

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT
OF PENNSYLVANIA

* * * * * * * * *

JOHN LEWIS GERHOLT, SR., Plaintiff
vs.
DONALD ORR, JR., Warden, Individually, Defendant

Civil Action No. 2:13-cv-00007-KRG-KAP

* * * * * * * * *

DEPOSITION OF
CORY LEE DIVELBISS
August 20, 2014

COPY

Any reproduction of this transcript is prohibited without authorization by the certifying agency.

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

2

DEPOSITION
OF

CORY LEE DIVELBISS, taken on behalf of the Defendant herein, pursuant to the Rules of Civil Procedure, taken before me, the undersigned, Michael G. Sargent, a Court Reporter and Notary Public in and for the Commonwealth of Pennsylvania, at SCI-Huntingdon, 1100 Pike Street, Huntingdon, Pennsylvania, on Wednesday, August 20, 2014, beginning at 11:04 a.m.

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

3

A P P E A R A N C E S

MICHAEL R. LETTRICH, ESQUIRE
Jones Pasodelis, PLLC
Gulf Tower
707 Grant Street
Suite 3510
Pittsburgh, PA 15219
COUNSEL FOR DEFENDANT

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

4

I N D E X

WITNESS: CORY LEE DIVELBISS
EXAMINATION
By Attorney Lettrich 7 - 48
DISCUSSION AMONG PARTIES 48 - 51
CERTIFICATE 52

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

EXHIBIT PAGE

| NUMBER | DESCRIPTION | PAGE IDENTIFIED |
|---|---|---|
| A | Drawing | 18 |
| B | Drawing | 20 |

OBJECTION PAGE

ATTORNEY PAGE

NONE MADE

P R O C E E D I N G S

--------------------------------------

CORY LEE DIVELBISS, HAVING FIRST BEEN DULY SWORN, TESTIFIED AS FOLLOWS:

--------------------------------------

EXAMINATION

BY ATTORNEY LETTRICH:

Q. Mr. Divelbiss, my name is Mike Lettrich. We met briefly before this deposition. And we are here today for a deposition in a lawsuit filed by John Lewis Gerholt, Sr., against Donald Orr, Jr. It's in the Western District of Pennsylvania in Federal Court at Docket Number 2:13-cv-0007.

Mr. Divelbiss, have you ever had your deposition taken before, this process?

A. No, sir.

Q. I explained to you briefly before we got started but I'll explain it more formally now. This process is called a deposition. And what that means is in civil cases in Federal Court, when a lawsuit's been filed,

the attorneys in the case have the opportunity to ask potential witnesses questions as to what they saw or heard or remember, the details that are facts. Those questions are under oath and they will be transcribed into a document called a transcript which I showed you beforehand. There will be a couple of things probably important to know about depositions as we get going; okay? The first thing is that it's difficult for a court reporter, because he's taking down verbal responses, it's difficult for a court reporter to record nods of the heads or when a person says uh-huh or uh-uh. So if you could, try to keep your answers verbal, yes or no, because it will make it easier for the court reporter; okay?

A. Yes, sir.

Q. The second thing is it's also difficult for a court reporter to take down two people talking at the same time. Sometimes you may know where

I'm going with a question and what to respond before I'm done talking. That's not a problem, except for it makes a problem for the court reporter. So if you could just wait until I get done speaking before you respond, it will make it easier for him; okay?
A. Yes, sir.
Q. Again, I'm going to ask you some questions. This isn't a memory test. If I ask you a question and the answer is that you don't know or you don't remember, and that's the fair answer, then that's what I'm looking for. I'm not expecting you to guess or speculate; okay?
A. All right.
Q. Similarly, none of these questions are trick questions. If I ask a question and you're not quite sure what I'm getting at, just tell me that and ask me to rephrase and I'll try to restate the question in a way that makes more sense; okay?

A. Yes, sir.
Q. Similarly, I have a tendency to talk kind of fast sometimes. If I ask you a question and you don't hear it, just let me know and I'll say the question again.
A. Understood.
Q. So if you answer a question, I'm going to assume you both heard it and understood it; is that fair?
A. That's fair.
Q. Could you state your name for the record, please?
A. Cory Lee Divelbiss, Inmate KT-8353.
Q. How do you spell Cory?
A. C-O-R-Y.
Q. And Divelbiss is D-I-V-E-L-B-I-S-S?
A. Yes, sir.
Q. And we are at SCI-Huntingdon currently?
A. Yes, sir.
Q. You're serving a term of incarceration here?

A. Yes, sir.
Q. And that's for arson; is that ---?
A. Yes, sir.
Q. Cory, at one time were you housed in the Bedford County Jail?
A. Yes, sir.
Q. What would the dates of that have been?
A. I was housed there from March 13th, the day of my arrest from about 3:30 to November 8th, the year of 2012 to about say 8:00 in the morning when they shipped me up to SCI-Camp Hill.
Q. When they had you in the Bedford County Jail, did you have a cellmate?
A. Yes, I did, Sir.
Q. Who was your cellmate?
A. John Lewis Gerholt, Sr.
Q. Who was the Warden of the ---?
A. At the time the Warden was Donald Orr.
Q. When you were in the Bedford

County Jail did you witness any physical altercations between Mr. Orr and Mr. Gerholt?
A. Yes. I witnessed one on May 15th, 2012, sometime in the morning. It was after everything was opened up and everybody was moving around. I'd say about 9:00, 10:00 in the morning, around there. Donald Orr, the Warden at Bedford County Jail came onto the block unescorted by any lieutenant or guards and he came up to the cell which was C Block, Cell One. And he came in the cell and told me to leave the cell, this was between him and Mr. Gerholt.
So I left the cell not wanting to stray too far. So I sat on the benches directly by the windows of the slider and was watching in the cell. And the Warden came in, grabbed John on the shoulder, shook him and started screaming Gerholt --- he screamed Gerholt like three times. And when John rolled over, I didn't hear what

he was saying but I witnessed him poking him in the chest with his index finger. And they had a ---.

Q. Let me stop you right there. Where was Mr. Gerholt at this time?

A. Mr. Gerholt was sleeping on the bottom bunk and I was sitting at the desk playing Solitaire.

Q. Please continue?

A. He was poking him in the chest while he was sleeping on the bottom bunk. And John lifted his thing up and the Warden started whispering something, couldn't make out what he said, and he said something. John sat up as the Warden was leaving and just looked at him and the Warden, when he was walking out of the block, out the slider was looking at me as I was looking at him just shocked at what I seen go on in the cell, stuff like that. And I went in and talked to John. John didn't thoroughly tell me what he said and I figured that was none of my business.

But later on that night, John wrote a --- wrote up a letter on what went on, the incident and stuff like that. I don't know if he sent it to his attorney or not. But he had me read it. I can't specifically remember what the letter said but it said if I would be a witness to what went on there. He signed it and then I signed it. And he got me a copy but the copy got lost somewhere in my transfers through prison.

Q. Sure. So you were in the cell playing Solitaire and John was on the bunk?

A. Yes, sir. He was asleep facing the wall.

Q. Had you had breakfast by that point in the morning?

A. Breakfast came at like around 6:00, 6:30 in the morning there, stuff like that. And he usually had me wake him up around the time meds came. And this was, I think, before meds, way before meds even happened. So that

would have been around, like I said, 8:00, 9:00 in the morning.

Q. Were you on any meds at that time?

A. No, sir.

Q. What about Mr. Gerholt; do you recall?

A. Yeah. Mr. Gerholt took meds but, I think he took something for depression and anxiety because of what went on in his case and stuff like that. He took them just to keep his stress levels down and stuff.

Q. So if I understand this correctly, the Warden came into the cell and told you to leave the cell?

A. Yes, sir.

Q. And said that that was between himself and Mr. Gerholt?

A. Yes, sir.

Q. So you walked out of the cell and you were on a bench?

A. Yes, sir.

Q. Where was this bench located relative to yourself?

A. All right. There's a bench right out front of the cell. Here's the cell door. Here's the one table. There's a table right there and there's a row of windows on Charlie Block. And then it would curve into the slider, the slider would be right about there. I sat at the far back table by the windows just amazed at what I seen. That's where I sat at, sir.

Q. Maybe it might be easier to understand if I had you draw a picture.

A. All right, sir.

Q. Why don't you draw --- I'm handing you a piece of paper and I'll ask you to draw a picture of where the cell is and where this bench is.

WITNESS COMPLIES

A. That's a shower right there. The cell would be right here beside the shower and the cleaning closet. This was the slider door and there's a back slider here.

BY ATTORNEY LETTRICH:

Q. Could you write the word cell next to where the cell is?

WITNESS COMPLIES

BY ATTORNEY LETTRICH:

Q. And write the word slider next to where you're describing the slider.

WITNESS COMPLIES

BY ATTORNEY LETTRICH:

Q. And when you say slider, you're referring to a sliding cell door?

A. Yeah. It was an electronic door. It slid open. I don't know the technical term for it but we refer to them as sliders.

Q. Okay.

A. I was sitting right here at the table back here against the windows.

Q. So the rectangular things you're drawing are in the ---?

A. Those are tables.

Q. Those are tables.

A. I'll label them as tables for you, sir.

Q. Thank you. Were these tables

sort of a dayroom type area?

A. Yeah, it was the dayroom area. They were picnic tables, like steel picnic tables bolted to the ground. And I sat down over there looking into the cell. My drawing might be a little bit off because it's just a small little sketch. But it had a straight view into the cell and you could see everything that was going on. The way Mr. Gerholt was laying, the beds face this way and his head was down here towards the window on the wall.

Q. I'll actually give you another piece of paper, you're going to draw the cell which could be helpful. Let's mark this first drawing as Exhibit A. He'll put an exhibit sticker on it for you.

(Deposition Exhibit A marked for identification).

WITNESS DRAWS CELL

A. That's the setup of the cell.

Mr. Gerholt had his --- always slept with his head down here at the window to keep --- because when you're down here, if you slept with your head down here, the desk blocked the view out into the cell. He always slept right there like that facing the wall. Because I'd sleep on the top bunk facing the other way to watch what was coming in the cell, stuff like that.

At the time I was sitting at the desk playing Solitaire and Mr. Orr came in through the slider, the slider would have been right there. He came onto the block, came up to the cell door and told me to exit the cell, this is between him and Gerholt.

So I left the cell and went towards the picnic table sitting by the far windows and sat down and observed what went on in the cell with Mr. Orr grabbing Mr. Gerholt on the shoulder and shaking him and screaming his name, poking him in the chest while talking to him in a low whisper.

I didn't understand what they were saying or nothing. Mr. Gerholt didn't say nothing back to him. When Warden Orr turned around and walked out the cell, Mr. Gerholt sat up in just like disbelief, somebody, one of the staff members would do that.

BY ATTORNEY LETTRICH:

Q. This photo --- rather, this drawing you made is very helpful so thank you for that.

A. You're welcome.

Q. Let's mark his second drawing as Exhibit B, please.

(Deposition Exhibit B marked for identification).

BY ATTORNEY LETTRICH:

Q. So when you were sitting at the picnic table, you were able to see in through the bars?

A. We had the door --- the door was the whole way open at the time because our county wasn't 23 and 1 or nothing like that. It was open all

day until I think about 10:00. And I was sitting there. When he told me to leave the cell, I went and sat at the bench watching the cell because that's considered my home. That's where I live. I watched him just shake him and when he rolled over like getting ready to take his towel off his eyes, just poking him in the chest, just whispering to him something. I don't know what it was, and Mr. Gerholt never said anything about what he said or nothing. But I went and, after Mr. Warden left, and sat down beside Gerholt and asked him what went on, what did he say, you know, in case he needed me to recollect on what he said or something like that. He was like he didn't even really know because he was half awake at the time when he was getting poked and screamed at. So I think he knew what was said, Mr. Gerholt was, but he just didn't want to bring me into nothing that would maybe cause me any problems further

down the road.

Q. I see. Did you ever speak about this incident with Warden Orr?

A. No.

Q. Did you ever speak about this incident again with Mr. Gerholt?

A. No. The last time I seen Mr. Gerholt I think it was September the 11th, 2012 when he went up to Camp Hill.

Q. Now, speaking of communications with Mr. Gerholt, have you two kept in touch by letter?

A. No, sir.

Q. Have you written him any letters since September 11th of 2012?

A. No, sir.

Q. Has he written you any letters from September?

A. No, sir.

Q. Has he called you on the telephone?

A. No, sir.

Q. Have you called him on the telephone?

A. No, sir.

Q. Have you communicated by email?

A. No.

Q. Have you been in contact with Mr. Gerholt in any way since September 11th of 2012?

A. No, sir.

Q. If I understood you correctly earlier, you don't have any sort of notes or records or documents about this incident? You said there was the one that Mr. Gerholt wrote but it got lost in transit between various facilities for you; is that correct?

A. Yes, sir. It was written on a legal sheet. His copy was written on a legal sheet. He might still have his copy. And mine, it was a photocopy, sent it down to the --- I don't remember what it was but you had to send it out and they had to take it. And they always read your legal work whether they were photocopying or not in the county jail. So he brought me back and gave me a copy of it on

white paper. It was made out to a legal form status. And I put it in my folder that I took upstate with me with all my stuff in it that I was allowed to take with me. And somewhere along the lines of me getting transferred from Camp Hill to here --- or from the county to Camp Hill it got lost in the process.

Q. I just want to confirm. If there was any writing, I'd like to see it just to be evidence in the case. So you said that Mr. Gerholt was laying on his side?

A. Yes, sir.

Q. With a towel over his head?

A. Yes, sir.

Q. Which direction was he facing on the bed?

A. He was facing the window, like looking out towards the window at the back of the jail. When he was sleeping he always slept with something wrapped around his eyes because of the sunlight from the

window. So he's sleeping with his back towards the bars.

Q. The Warden asked you to leave the cell?

A. Yes, sir.

Q. He said it was between him and Mr. Gerholt?

A. Yes, sir.

Q. You went out and then you heard him say Gerholt, Gerholt?

A. Yes.

Q. Was it your impression that he was trying to wake him up?

A. My impression was yeah, he was trying to wake him up, but it seemed like kind of an angry, violent tone. Because I went in and woke Mr. Gerholt up a couple times for medication and all you need to do is go Gerholt, and he's usually up in one sit-up to get up for meds. But this here was like a violent, multiple yell at the same time, like rapidly yelling Gerholt and shaking his shoulder and poking him in the chest.

When he went to roll over the Warden was standing like, I'd say about six, seven inches from the bunk poking him in the chest, leaning like towards his face and ear whispering something real vulgar while poking him. I don't know what it was but, you know, it must have been something not nice or something because it was all whispering. He might have not wanted no one to hear what he was saying.

Q. So when he said Gerholt, Gerholt, was that before he started poking or was he poking and saying this at the same time?

A. He was shaking him on the shoulder still yelling Gerholt. And then when Mr. Gerholt rolled over, he was poking him in the chest saying Gerholt. And then it went to some whisper, like sort of a whisper. When Gerholt went to sit up, stuff like that, I guess he could see out from underneath this thing there and it

seemed like some dress pants or something. It wasn't like regular guard or something. And he was poking him in the chest whispering something.

Q. Have you ever seen Warden Gerholt (sic) interact with any other inmates that way?

A. Mr. Orr?

Q. Excuse me, yes, Mr. Orr.

A. No, I've never seen him interact with any other inmates that way. But a lot of people just tried to stay out of his way when he came on the block. Like a lot of people would just leave the block and go to their cells because, you know, him being a figure of authority, he could put you under the jail if he really wanted to. And everybody, I guess, was scared of him.

Q. When you say put you under the jail, you mean he would do something to you that you wouldn't like?

A. Yeah. More or less make your stay there real uncomfortable.

Q. I see. Did Warden Orr ever do anything to make your stay there uncomfortable?

A. Just that incident right there because that made me more really aware of my surroundings and stuff like that. And I sort of felt unsafe around like high officials and stuff like that, that I wouldn't even go talk to them out in the hall without like another inmate watching or something like that. I wouldn't go. He just made me feel uncomfortable, like you know, what if he comes in and does that to me, you know.

Q. Sure. I understand. How long do you think this interaction between Warden Orr and Mr. Gerholt lasted?

A. I'd say it lasted about a good five, ten minutes at the most. Because he was whispering for a good minute. And I didn't really look at the clock because the clock was behind me and stuff like that. I just kept an eye on what was going on and stuff,

I'd say about five, ten, man.
Q. So he woke him up by yelling Gerholt and poking him in the shoulder?
A. Grabbed him on the shoulder. It was like a physical grab, I'd say sort of like a handshake grab on the shoulder, shook him a little bit. And as he started to turn while he was screaming Gerholt while he was shaking him and saying --- screaming Gerholt while poking him in the chest with an index finger, as Gerholt went to go sit up and went back down like all in shock.
And he kept poking him whispering something like I'm authority figure, you know what I mean, you ain't got nothing to do here, stuff like that. That's how it came off is he's one of the ones you can't touch me and stuff like that while poking him like authority?
Q. I think I understand now. So he was sleeping on his side facing the

window with a towel over his head?
A. Yes, sir.
Q. Warden Orr came in, yelled Gerholt, Gerholt, poked him and grabbed his shoulder and flipped him back over so that that way he was laying on his back and his chest was facing him?
A. No.
Q. No?
A. Mr. Orr came in, told me to leave the cell. I went over and sat on the bench. Mr. Orr came in, first he grabbed him by the shoulder, shook him yelling Gerholt. And as John went to roll over towards himself, I guess he must have --- his line for his eyes must have caught a glimpse of like some pants because Donald Orr, the Warden, always wore specific shoes with like some little buckle on them or something and you knew that man when you seen him. He must have seen them and laid back down. While he was laying down, he was poking him in the

chest, whispering in his ear something after yelling Gerholt multiple times and poking him, too. I don't know what was going on there, what was said. That's particularly not between me, that's Gerholt and him.
Q. I suppose here's the part where I'm confused, Cory, is whenever the Warden was allegedly poking him in the chest, how was Mr. Gerholt laying at that time?
A. Mr. Gerholt, he was on his back.
Q. He was on his back at this point?
A. Yeah. He's laying flat on his back like he's just shocked. But he didn't have his eyes uncovered or nothing like that. He figured --- I mean, that might be the best solution, pretend you're sleeping or something, while poking him in the chest whispering something towards his ear, stuff like that, just kept poking him the whole time. And then the Warden

left the block and just looked at me. And John was sitting up at that time looking at me. And I was just watching the Warden walk out, like in shock. I've never seen a staff member do this to somebody.
Q. I'm sorry, I'm still a little confused here as to how he got from laying on his side facing the window to being on his back.
A. When Warden Orr grabbed his shoulder screaming Gerholt, John was rolling over at the same time as the Warden let go of his shoulder. He went to roll over and the Warden was still saying Gerholt, poking him in the chest. And he went --- John went to go sit up a little bit and then he went back down. I guess he realized who it was or something, poking him in the chest screaming Gerholt and whispering something in his ear after Mr. Gerholt laid back down. Mr. Gerholt rolled over himself just as the Warden was letting off his

shoulder and went to poking him in the chest saying Gerholt.

Q. I think that was helpful. And if I understand what you're showing me there, you were gesticulating a little bit. Mr. Gerholt was on his side facing the window so he would have been on his left side?

A. Yes, sir.

Q. The Warden came in and grabbed him by the shoulder. At that time Mr. Gerholt started to sit up a little bit.

A. Started to roll and sit.

Q. Roll and sit. So he was moving --- he was turning from being on his left-hand side turning so he would be facing ---?

A. Out towards the cell, like on his back like he was getting ready to roll up out of bed. And that's when the Warden started poking him in the chest and saying something after screaming Gerholt while poking him in the chest. He went down still

continuously poking him whispering something in his ear.

Q. Did Mr. Gerholt ever tell you what it was the Warden said to him?

A. No, he didn't, sir. He never said anything about it. I've asked him a couple times what it was and so if I ever did come to the time that if something did ever erupt from this, you know, I have more valuable information to give. And he never said nothing about it. He wrote that letter up like I said. It was dated for May 15th, 2012. And I think he might even have a copy but I'm not sure. I'm not sure if he's --- where his copy ended up, even if he still has it or --- he might have sent it to his lawyer with the rest of his legal work or something.

Q. I'll ask him for it. Hopefully he still has a copy of the thing.

When a person is an inmate, there's a process called a grievance process; are you familiar with that?

A. Yes, sir.

Q. You have grievances here at SCI Huntingdon, I take it?

A. Yes, sir.

Q. And there were grievances at the Bedford County Jail, too?

A. Yes, sir.

Q. My understanding from Mr. Gerholt is that he didn't file a grievance on this?

A. No, sir. He didn't file no paperwork because I think the way he was thinking on it, if you filed paperwork, that it would end up at the wrong lieutenant's hands that would take it to the Warden. And it would just, you know, vanish.

Q. So when a person would file a grievance at the Bedford County Jail --- explain to me how that process would work.

A. Well, if you need to file a grievance at the Bedford County Jail, you usually ask the guard when they come on block. And when they come on

you can ask them for request slips, medical slips, grievance forms and stuff like that and they'll go back to the ??? And when they come in on their next round they'll deliver it to you by hand with your name and stuff like that filled out, your county inmate number when you came in.

And you fill it out and you'll put it in a box and then the third shift lieutenant will come by and pick it up. And whatever happens from there with it, either it goes through the processes or it just vanishes.

Q. When you say it just vanishes, what do you mean?

A. Either it just gets crumbled up, thrown away or shredded and never gets responded back to. Or you just get does not affect you personally, put back on cell.

Q. Did you file any grievances yourself when you were in the Bedford County Jail?

A. No, sir.

Q. So my understanding is that Mr. Gerholt didn't file a grievance because he felt that it wouldn't have been worth his time because it ultimately could have gone to Warden Orr who was involved in this?

A. Yes, sir.

Q. Did you speak with any of the correctional officers or lieutenants or anybody else about this incident?

A. No, sir. I really tried to stay out of the guards' way, stuff like that, because either --- anything you'd tell them, like say if I had codefendants on an another block and I said something about my codefendant, that would so happen travel from that guard to that block and stuff like that and it would cause a big ruckus. And then the guards say that incident happened. If John or me went to the staff, we said something to them, like even one of the white shirts, it would go on back to the Warden and probably create another escalated event.

Q. Do you know if Mr. Gerholt said anything to any of the correctional officers or lieutenants about this?

A. No. I have no recollection on that, sir. But I know the third shift lieutenants, if you told them something, they just looked at you and laughed. And the third shift guards, they were like the regular gray shirt guards. They were decent people. They actually took the time to help you out on something. But there's just a line between inmates and guards that you don't want to cross, you know what I mean? You don't want to be seen really talking to them, even if it's something as serious as that because then you get labels and stuff like that.

Q. Do you know if anybody else witnessed this event besides yourself?

A. There was somebody sitting in the back of the block on the phone. I'm not sure who it was. I really can't remember all the people that

were on that block at that time, sir. But there was somebody sitting on the back of the block. There was somebody in the shower upstairs. And me sitting on the block, that makes about three of us that were out of the cells. I think everybody else went in and went back to sleep.

Q. If a person was, you say upstairs in the showers?

A. Yes, sir.

Q. Would they be able to see into John's bunk?

A. No, sir. Those showers would face the outside wall, like the windows where my back was turned against it sitting at the rec, sitting at the table.

Q. If a person was on the telephones they wouldn't be able to see ---?

A. No. That's way in the back of the block and you're just looking forward at the block. You can see the tables and the whole way out through

the slider you can see central right there, the bubble. And then you can see the rec yard out there. That's basically all you can see.

Q. So as far as you know, the only three people that witnessed this event were yourself, John Gerholt and Donald Orr; is that correct?

A. Yes, sir.

Q. We've talked about quite a few things about this incident here. Is there anything else that you can remember from that day?

A. No, sir.

Q. Do you know if John required medical attention after this incident?

A. No. He didn't go down to medical or anything like that. He just kind of stayed to his cell until it came time towards trial time and stuff like that. He just stayed away from a lot of people. I'd sit and conversate with him because, you know, he got along with me. He'd call me like one of his kids, more or less.

And he'd look out after me and stuff like that on the block. He's a fairly good man in reality, you know, besides what happened on the outside, you know what I mean? Everybody has their downfalls in the world sometimes. But he's never ??? But I've never seen him go down to medical for this incident or anything like that, sir.
Q. I see. Do you know if he had --- and again, this is if you know, this is not a memory test or you wouldn't necessarily have occasion to know this, but do you know if he had any sort of medical conditions before this incident?
A. Before he got arrested or before the incident with the Warden?
Q. Before the incident with the Warden, if you know.
A. No, I don't think he had any. But when he got sentenced and stuff like they did put him on some pretty high dosage medication. That's way after this incident though, put him on

some high dosage medication. He just sat there like a zombie, I'd say, like he was dumbfounded.
Q. I see. So I get the impression from what you've told me here so far today you feel that Warden Orr was wrong by this interaction?
A. Yes, sir.
Q. Why is that exactly?
A. In technicality, they're not really supposed to lay hands on you unless they're --- unless it's either causing a threat to another inmate or another staff member. They're not supposed to come in your cell like he was a head up official, he was not supposed to come in your cell without being escorted by either a lieutenant or COs at the time. And in technicality that's breaking all the rules. He laid a hand on an inmate. I don't know if you could call that assault and verbal assault or not, I don't know what you'd call that. He was unescorted by CO, stuff like that.

It's how I feel he was in the wrong. He shouldn't have laid hands on Mr. Gerholt like that.
Q. And when you say lay hands, you mean on his shoulder ---
A. Grabbing on his shoulder and ---
Q. --- poking him in the chest?
A. --- poking him in the chest. That's still physical interaction, you know. They're not supposed to touch us.
Q. Right. Have you ever seen anything like that happen here at SCI Huntingdon?
A. No, sir.
Q. Have you ever seen anybody do anything like that at the Bedford County Jail?
A. Just with the incident with Warden Orr and John Gerholt.
Q. Have you ever seen anything like that transpire at any other correctional institution if you've never been anywhere else?

A. No, sir.
Q. Cory, I know that you're currently serving a sentence for arson. I'd just like to ask you briefly about any other convictions you might have had between the ages of 18 and I understand you're 21 now?
A. Yes, sir, I'm 21.
Q. Is arson your only conviction since ---?
A. My adult charge?
Q. Yes.
A. It's my only adult charge that I have, sir. And that's two and a half to five and I'm currently maxing out a five-year sentence on it.
Q. Congratulations. When will you be released?
A. March 13th, 2017.
Q. Okay. I thought you were implying that you would be getting out soon which I was going to say ---.
A: Maximum. No, sir.
Q. Sorry to hear that.
A. That's all done by my choice,

sir. I don't want to sit on parole or probation because my mom and dad are up in their 60s now. They're almost at the age of retirement technically and I don't want, you know, a parole officer coming there bugging them any --- midday or midnight, you know what I mean? I want my family left alone by any parole officers.

Q. Makes sense. Cory, we've talked about a lot of things here today. Is there anything else you can think of that you remember from this day or from this incident?

A. No, sir. That's just about it.

Q. Is there anything you remember would have happened after this incident that you think is, you know, relevant to this incident?

A. To like Warden Orr and Gerholt ---

Q. Yes.

A. --- other situations involving the Warden?

Q. Yes. Either other situations

involving him, Gerholt and Warden, or anything that would follow up to this incident we've just discussed?

A. Well, I'm not too certain on how true this information is or how certain it is or how reliable it is. But I was told that he was in the old library down by --- I'm trying to think of the block, the Gulf block was the whole --- Foxtrot was the whole, Gulf was out center.

He was on the female unit --- not the female unit but he was at the library which they had black plastic bags on the window that could observe the female block. And I heard he was doing some not so decent things in the library while watching female inmates.

Q. Are you talking about Orr or Gerholt?

A. Orr, sir. But I don't know how true that information is. That's just what you overhear guards talking about in the county jail come the time when he got fired from there. And I've

heard another situation that he always carried a loaded gun, like a revolver on his one ankle in an ankle holster.

And I know you're not allowed a weapon in a corrections facility at all because even the State Police check them into the little lock box before they even come in the jail to take you to court or something. But I don't know how reliable them two things are. I can't remember the guard that told me about them or anything like that. But that's just what you heard through the grapevine.

Q. Rumors. Sure. I appreciate that. Any kind of information you have is helpful. And again, you haven't had any contact with Mr. Gerholt ---

A. No, sir.

Q. --- in any way, shape or form?

A. No, sir.

Q. You haven't had any contact with Warden Orr in any way, shape or form?

A. No, sir.

Q. I believe that may be all the questions I have for you today.

A. All right, sir.

Q. Before we do, sometimes when you start telling a story, when you discuss certain details it can jog your memory about other things. Is there any sort of information about any of your other earlier questions that would either change your answer or amend your answer or thought of something else?

A. No, sir. I feel my answers that I answered to your questions are set in stone.

Q. Very good.

ATTORNEY LETTRICH:

Thank you very much.

A. Yes, sir.

ATTORNEY LETTRICH:

Now, as we discussed before the deposition, you're going to --- the court reporter is going to type up the

49

questions I asked you and your answers into a document called a transcript. You've got two choices, they're up to you.

You can either have the court reporter send you a draft copy of the transcript so you can read it and if there are any words that he wrote down one thing and you meant something else, then you can make changes to it. That's option number one.

Option number two is you can rely upon the court reporter's expertise in taking this testimony down in what we call waive signature. You've got your choice of either one.

A. Could you explain to me what waive signature is?

ATTORNEY LETTRICH:

What would happen is if you waive signature as opposed to him sending the draft copy

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

50

where you would sit down and read through it and make any --- if you feel a correction is necessary make a correction. That's option number one.

Option number two would be you would just say don't worry about that process, I don't need to read it, I'll rely upon your expertise and he'll just type it up. That's what's meant by waive signature.

A. Well, I'd like a copy for myself just stating that I did talk to you individuals on this day ---

ATTORNEY LETTRICH:

Yes.

A. --- and stuff like that, this is what I said in case, you know, something comes back, like if you guys say lose a copy of it and you know I have a copy I can send you that copy so you guys got it. And then I still have my copy.

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

51

ATTORNEY LETTRICH:

My suggestion in that case would be that you read it so that way you have an opportunity to actually physically see and you can, you know, do what you need to do; okay?

A. Yes, sir.

ATTORNEY LETTRICH:

Thank you.

* * * * * * * * *

DEPOSITION CONCLUDED AT 11:43 A.M.

* * * * * * * * *

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908

52

COMMONWEALTH OF PENNSYLVANIA)
COUNTY OF CAMBRIA )

CERTIFICATE

I, Michael Sargent, a Notary Public in and for the Commonwealth of Pennsylvania, do hereby certify:

That the witness whose testimony appears in the foregoing deposition, was duly sworn by me on said date and that the transcribed deposition of said witness is a true record of the testimony given by said witness;

That the proceeding is herein recorded fully and accurately;

That I am neither attorney nor counsel for, nor related to any of the parties to the action in which these depositions were taken, and further that I am not a relative of any attorney or counsel employed by the parties hereto, or financially interested in this action.

Michael G. Sargent

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
MICHAEL G. SARGENT, Notary Public
Johnstown, Cambria County, PA
My Commission Expires Feb. 8, 2018

SARGENT'S COURT REPORTING SERVICE, INC.
(814) 536-8908